COURT OF APPEAL, THIRD CIRCUIT

**STATE IN THE INTEREST OF**

**N. F.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
LAFAYETTE CITY COURT
PARISH OF LAFAYETTE, NO. JC201200133
HONORABLE RONALD D. COX, CITY COURT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN D. SAUNDERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Phyllis M. Keaty, Judges.

**AFFIRMED AS AMENDED.**

**Michael Harson**
**District Attorney, 15th JDC**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
        **State of Louisiana**

Sonia Gupta
Assistant District Attorney
P. O. Box 3306
Lafayette, LA 70502
(337) 262-8624
COUNSEL FOR PLAINTIFF/APPELLEE:
 State of Louisiana

Annette Fuller Roach
Louisiana Appellate Project
P. O. Box 1747
Lake Charles, LA 70602-1747
(337) 436-2900
COUNSEL FOR DEFENDANT/APPELLANT:
 N. F.

**SAUNDERS, Judge.**

On July 12, 2012, N.F., a juvenile, was charged by petition with the aggravated rape of D.W. (age 3), a violation of La.R.S. 14:42. N.F. denied the allegations in the petition. After a hearing, the trial court denied N.F.'s motion to suppress his statements to the police and to the Department of Children and Family Services. On December 13 and 14, 2012, the trial court heard evidence and agreed to leave the record open until January 8, 2013, for the testimony of Dr. Daniel Lonowski. The trial court then adjudicated N.F. a delinquent for the commission of aggravated rape and ordered a post-adjudication pre-disposition sexual offender assessment of N.F. Subsequently, on March 14, 2013, the trial court committed N.F. to the Department of Public Safety and Corrections, Office of Juvenile Justice (OJJ) for five years, suspended, and placed N.F. on five years of supervised probation with conditions. That same day, N.F. filed a timely Motion for Appeal and Designation of Record, which the trial court granted. N.F. is now before this court, alleging four assignments of error. We affirm N.F.'s adjudication and disposition subject to the amendment discussed herein.

FACTS AND PROCEDURAL HISTORY

Around 10:00 p.m. on July 3, 2012, D.W. was brought to Women's and Children's Hospital with a complaint of vaginal bleeding. When D.W. was examined by Dr. Glenn Borne, the pediatric emergency room physician, Dr. Borne noted that D.W. had a "very large vaginal laceration that was actively bleeding." Dr. Borne did not believe the injury was an accidental injury but the result of forceful penetration. Dr. Borne consulted the pediatric surgeon, Dr. Kenneth Falterman, who repaired the laceration on the skin and into the vagina. During his initial examination of D.W., Dr. Falterman also saw evidence that the perforation of the vagina entered into D.W.'s abdominal cavity. Dr. Falterman performed a

second operation, a laparoscopic procedure in which a scope was used to look for further injuries. Dr. Falterman did not see any further injuries.

On July 4, 2012, Detective Duncan McGalliard of the Lafayette Police Department responded to a call at Women's and Children's Hospital. At the hospital, D.W. told Detective McGalliard that N.F. (age 12) hurt her and made her bleed. D.W. and her siblings had been visiting their dad at the home of their dad's girlfriend, Latoya. N.F., one of Latoya's children, was also at the house. Detective McGalliard asked a patrol unit to pick up N.F. from his house and transport him to the Lafayette Police Department for questioning. N.F. was brought to the police station with his mother. In the interview, N.F. initially told Detective McGalliard that D.W. started bleeding when he was helping her dry off and get dressed after taking a bath. N.F. denied touching D.W. or putting anything inside of her. Detective McGalliard continued to question N.F. and stressed to N.F. that he needed to tell the truth. Eventually, N.F. answered, "Um hm" when Detective McGalliard asked him if he put his penis inside of D.W. When asked if he put "it" in and pulled "it" right back out, N.F. responded, "Yes, sir." N.F. stated that D.W. then started bleeding.

Later that same night, N.F. was interviewed by Chastity Harding of the Department of Children and Family Services. The interview took place at the Juvenile Detention Center in Lafayette. When Ms. Harding initially arrived at the detention center, she was told that N.F. was in bed. When N.F. was brought to meet her, he asked Ms. Harding if he could go back to bed when they were finished. Ms. Harding told N.F. that he could go back to his room when they were finished talking. According to Ms. Harding, N.F. told her that when he took D.W. out of the tub, he took her into a room, put her on the bed, and told her to lie on her stomach. N.F. then said that he put "it" in, and D.W. told him to stop. N.F. said he

2

stopped, took "it" out, and blood came out.  N.F. was subsequently charged by petition with the aggravated rape of D.W.

## ASSIGNMENTS OF ERROR

1. The juvenile judge erred when he denied the motion to suppress the statements made by the twelve-year old juvenile to a detective and to a child protection investigator.

2. The juvenile court erred in concluding that D.W. was competent to testify at the adjudication hearing and that the Hearts of Hope taped interview was admissible at the hearing.

3. The juvenile judge erred in admitting the videotaped statement of D.W., as it was impermissible hearsay and a denial of N.F.'s right to confront his accuser.

4. The evidence introduced at the adjudication hearing was insufficient to prove all of the elements of the offense of aggravated rape beyond a reasonable doubt under the standard of review applicable in delinquency proceedings.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record.  After reviewing the record, we find there are several errors patent.

First, the trial court failed to advise N.F of his rights as required by La.Ch.Code art. 855.  In *State v. Erven*, 36,332 (La.App. 2 Cir. 10/23/02), 830 So.2d 368, the court held that at the appearance hearing to answer the state's petition, the court is required, pursuant to La.Ch.Code art. 855, to first determine if the juvenile is capable of understanding his/her rights, and if so, to advise the child of his/her rights, including the nature of the proceedings, the nature of the allegations of the petition, the right to an adjudication hearing, the right to appointed counsel, and the right against self-incrimination.  However, the record in the present case indicates the juvenile was represented by counsel and denied the

allegation. Thus, we find the error was harmless. *See State in Interest of J.G.*, 94-194 (La.App. 5 Cir. 7/26/94), 641 So.2d 633.

Second, the record indicates the adjudication was untimely held. Pursuant to La.Ch.Code art. 877, N.F.'s adjudication hearing should have been set within sixty to ninety days of July 12, 2012, depending on whether he was continued in custody, except for good cause shown. It was initially set for August 9, 2012, which is within the sixty-day time period. The trial court reset the adjudication date to October 4, 2012. In September 2012, the State filed a motion to continue, claiming delays associated with the criminalist report on DNA analysis, a pending investigation request, the need to address N.F.'s motion to suppress, and that N.F. had indicated a need for more time as well. A hearing was held in October 2012, and N.F.'s attorney acknowledged it was a joint motion. The trial court granted the motion, and the matter was set for December 13, 2012. The adjudication commenced on that date. We find that the State proved that good cause was shown for the delay; thus, any error is harmless. *See State in the Interest of R.D.C, Jr.*, 93-1865 (La. 2/28/94), 632 So.2d 745.

Third, there was a delay in the disposition. Louisiana Children's Code Article 892 provides that the court shall conduct a disposition hearing within thirty days after the adjudication, prior to entering a judgment of disposition, except for good cause. The trial court adjudicated N.F. on January 8, 2013. The disposition hearing was held on March 14, 2013, more than thirty days after the disposition. However, on January 30, 2013, the State filed a "Motion for Continuance of Disposition Beyond 30 Days from Date of Adjudication." In the motion, the State stated OJJ required until mid-March to complete its pre-disposition assessment. The trial court granted the continuance and set the disposition for March 14, 2013. We find that the State showed good cause for the delay. Additionally, N.F. did not

4

file an objection to the delay, and he fails to show any prejudice suffered. Thus, we find any error is harmless.

Fourth, the record before this court does not indicate the trial court gave N.F. credit for time spent in secure detention, if any, prior to the imposition of disposition, as required by La.Ch.Code art. 898(A). Thus, this court amends the disposition to give N.F. credit for time served in a secure detention facility and instructs the trial court to note the amendment in the court minutes. *See State ex rel. M.M.*, 06-607 (La.App. 3 Cir. 11/2/06), 941 So.2d 716.

Finally, the trial court failed to inform N.F. of the two-year prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Although the Children's Code contains no similar provision, this court has previously held that this notice should be given. *State in the Interest of J.C.G.*, 97-1044 (La.App. 3 Cir. 2/4/98), 706 So.2d 1081 and *State ex rel. J. F.*, 03-321 (La.App. 3 Cir. 8/6/03), 851 So.2d 1282. This court orders the trial court to inform N.F. of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof in the record that N.F. received the notice.

## ASSIGNMENT OF ERROR NO. 4:

In his fourth assignment of error, N.F. argues that the evidence introduced at the adjudication hearing was insufficient to prove all of the elements of the offense of aggravated rape. The standard of review for sufficiency of the evidence to support a conviction is that "the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville,* 448 So.2d 676, 678 (La.1984) (footnote omitted).

5

The trial court's findings of fact are subject to the manifest error standard of review; "the appellate court should not disturb reasonable evaluations of credibility and reasonable inferences of fact absent manifest error." *State in the interest of C.P.*, 12-192, p. 4 (La.App. 3 Cir. 6/6/12), 91 So.3d 1273, 1277.

Additionally, a review of the record for sufficiency of the evidence "encompasses all of the evidence introduced at trial, inadmissible as well as admissible." *State v. Bolden*, 11-2435, p. 2 (La. 10/26/12), 108 So.3d 1159, 1161. As the fifth circuit court stated in *State in the Interest of S.L.*, 11-883, p. 8 (La.App. 5 Cir. 4/24/12), 94 So.3d 822, 830:

> [I]f the entirety of the evidence, both admissible and inadmissible, was insufficient to support the conviction, the defendant is entitled to an acquittal and no further inquiry as to trial errors is necessary. *State v. Hearold*, 603 So.2d 731, 734 (La.1992); *State v. Jones*, 05–840 (La.App. 5 Cir. 3/28/06), 927 So.2d 514, 519. On the other hand, when the entirety of the evidence, even evidence erroneously admitted, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial. *Hearold, supra.*

As discussed herein, we find the statements made to Ms. Harding to be admissible, and the admission of statements made to Detective McGalliard harmless error. Furthermore, the trial court found "there was an overwhelming amount of testimony from everybody in the case and the Court has to deal with the truth and veracity of each one of the witnesses." The trial court also explained:

> The Court did not find him guilty because he said he did it or didn't do it, because he gave two (2) statements. The Court felt that the State proved this case beyond a reasonable doubt based on the facts. The - - victim's test - - the Court gave a lot of weight to the victim's testimony. To the - - to the testimony of the doctors. From the testimony - - everybody else that testified, I felt that the case was proved beyond a reasonable doubt.[1]

---

[1] While the trial court may have considered N.F.'s statement to Detective McGalliard in the cumulative evidence, we omit this statement from our discussion because we have declined to rule on its admissibility. Likewise, this statement is excluded from the evidence which we find is sufficient to uphold N.F.'s conviction.

6

We agree that the evidence was sufficient to adjudicate N.F. a delinquent for the commission of aggravated rape.

## ASSIGNMENT OF ERROR NO. 1:

In his first assignment of error, N.F. alleges that the trial court erred in denying his motion to suppress the statements he made to Detective McGalliard and Ms. Harding. N.F. argues that his statement to Detective McGalliard should have been suppressed because it was not a knowing and voluntary confession due to N.F.'s young age, the absence of an interested and competent adult to accompany N.F. during the interview, N.F.'s lack of understanding of his rights, and Detective McGalliard's improper coercion and intimidation. In its brief, the State responds that it met its burden of showing that N.F. was properly informed of his *Miranda* rights as well as its burden of proving that N.F.'s statements were freely and voluntarily made without undue influence, fear, duress, intimidation, menaces, threats, inducements, or promises. The trial court, after listening to the interview on tape, found that Detective McGalliard was not coercive and that N.F.'s statement was a knowing and voluntary confession, in part because Detective McGalliard used a soft tone of voice and the interview was relatively short, lasting twenty-one minutes.

We note that the trial court is afforded great discretion in its finding pursuant to the hearing on the motion to suppress. *State v. Lee*, 05-2098 (La. 1/16/08), 976 So.2d 109. Ultimately, we pretermit the question of whether the trial court abused its discretion in denying the motion to suppress N.F.'s statement to Detective McGalliard as this evidence is cumulative, and we are able to decide the case without consideration of this statement. Accordingly, we give no weight to N.F.'s statement to Detective McGalliard in arriving at our conclusion.

N.F. also argues that his statement to Ms. Harding of the Department of Children and Family Services should have been suppressed. Ms. Harding interviewed N.F. regarding a report of inadequate supervision of D.W. On July 4th, the same day that N.F. spoke to Detective McGalliard, Ms. Harding went to the Juvenile Detention Center in Lafayette to speak with N.F. N.F. was brought to a room to speak with Ms. Harding. According to Ms. Harding, N.F. told her the following:

> He said that D.W. was in - - taking a bath with his sister and her brother. I said, "What happened after that?" He said, "I took D.W. out of the tub, and I brought her in the room, and I was supposed to dry her off." I said, "What did you do instead of dry her off?" He said that he put her on the bed and told her to lie on her stomach. And I said, "What did you do when you told - - after you told her to lie on her stomach?" He said that he told her that she was going to get a whipping. And I said, "Why did you tell her that she was going to get a whipping?" And, he said because she didn't want to lay on her stomach. I said, "But why would you say that she was going to get a whipping?" He said because she - - her dad whips - - she was going to get a whipping by her dad, because she is always being bad. And I said, "What happened after that?" He said D.W. did lay on her stomach and that he put it - - he put in [sic] in. I said, "What did D.W. say to you? Did D.W. say anything when you put it in?" And he said that she told him to stop. He said, so he stopped, and when he took it out, the blood came out. So I asked him "What did you do after that?" He said that he put a towel down. I said, "Was anyone else in the room?" And, he stated no. I said, "What happened after you put the towel down?" He said my sister came into the room, and asked me what happened. He said, but I didn't tell her what happened. I said, "So what happened after your sister came into the room?" He said that the sister left out of the room to go get a neighbor. And I asked him, "Well why would she have to get a neighbor. Where was your mom?" and he said that his mom was sitting outside. And after that I asked him, you know, was he scared when he saw the blood and he said, "No." I also asked him how did he feel about what happened, and he did say he was sorry for what happened. And I asked him if he was scared to be in the Detention Center and he stated, "No."

Without giving reasons other than it had reviewed the case law, the trial court found N.F.'s statement to Ms. Harding was admissible.

At the suppression hearing and on appeal, N.F. argues that his statement to Ms. Harding should be suppressed because no *Miranda* warnings were given. The

8

State argues, however, that Ms. Harding was not acting as an agent of law enforcement and was, therefore, not required to give N.F. *Miranda* warnings.

Both defense counsel and the State recognize *State v. Bernard*, 09-1178 (La. 3/16/10), 31 So.3d 1025, as the authoritative case for this issue. In *Bernard*, the court was faced with determining "whether a child protection worker should have given *Miranda* warnings to the arrested and incarcerated defendant . . . before she interviewed him." *Id*. at 1026. The court held that there is no bright-line rule for making such a determination but that the determination must be made on a case-by-case basis:

> [C]ourts must consider the totality of circumstances in each case. The most important factors are those discussed in *State v. Perry*, 502 So.2d 543 (La.1986): whether the investigator discussed the case with police prior to the interview, whether the interview was conducted at the police's request, and whether the primary purpose of the investigator's visit was to elicit a confession while in cahoots with law enforcement. In short, police may not circumvent *Miranda* by using OCS investigators (or anyone else) as stand-ins to conduct interrogations in their stead.

*Id.* at 1035. The court further noted that "[a]s a general rule, it is left to the trial court to determine whether a person conducting an interrogation is acting as an agent of law enforcement." *Id.*

In the instant case, Ms. Harding testified that the purpose of her interview was to make a determination on the specific allegations reported to the agency. According to Ms. Harding, when she interviewed N.F., her investigation was not "in any way directed at criminal charges against him." Ms. Harding testified that she did speak with Detective McGalliard before she interviewed N.F. in order to find out where N.F. was located. The day following the interview, Ms. Harding called Detective McGalliard to inform him that she had interviewed N.F. According to Ms. Harding, she did not tell the detective anything other than that she did interview N.F. Additionally, the detective did not tell her anything else

9

regarding N.F. Ms. Harding testified that she did not conduct the interview at the request of the police department, and she was not instructed by the police as to what questions to ask. Ms. Harding did not discuss N.F.'s case with law enforcement or any district attorneys prior to interviewing N.F. and did not read any police report prior to interviewing N.F. However, Ms. Harding testified that her agency turns in a report to the District Attorney's Office when it has a valid case.

Appellate counsel submits that Ms. Harding did not explain to N.F. that she was not there to interrogate him about the alleged crime nor did Ms. Harding volunteer to leave if N.F. did not want to speak to her. Appellate counsel asserts that "[a] twelve year-old boy could not have been expected to understand he could refuse to speak with her or the ramifications if he did speak to her" nor could the twelve-year-old boy understand that the child protection worker was not questioning him in a law enforcement capacity.

Considering the totality of the facts in the instant case, we find that Ms. Harding was not acting as an agent for law enforcement. Ms. Harding did not conduct the interview at the request of the police department, was not instructed by the police as to what questions to ask, did not discuss N.F.'s case with law enforcement or any district attorneys prior to interviewing N.F., and did not read any police report prior to interviewing N.F. Ms. Harding did not interview N.F. in order to investigate the criminal allegations against N.F., nor is there any testimony that the charge brought against N.F. was increased as a result of Ms. Harding's report. Most importantly, there is no evidence that the police purposefully used, manipulated, or were in cahoots with Ms. Harding for purposes of conducting the interview on their behalf. Under these circumstances, we find that the trial court did not abuse its discretion in finding that no *Miranda* rights were required to be

10

given before Ms. Harding interviewed N.F. Thus, the trial court did not abuse its discretion in denying N.F.'s motion to suppress his statement to Ms. Harding.

For the foregoing reasons, even if we were to find the statement to Detective McGalliard was involuntary, the error is harmless in light of N.F.'s subsequent statement to Ms. Harding and the other evidence introduced at trial. N.F. told Ms. Harding that he put "it" in, and D.W. told him to stop. N.F. said he stopped, took "it" out, and blood came out. D.W. testified in both the Hearts of Hope interview and the adjudication hearing that N.F. was "getting on [her]." D.W. also stated in the Hearts of Hope interview that N.F. made her bleed. At the adjudication hearing, D.W. nodded when asked if the blood started after N.F. got on top of her. N.F.'s sister testified that she, D.J., and D.W. all took a bath together and that D.W. was not bleeding when N.F.'s sister put her in the tub. N.F.'s sister called N.F. to get D.W. out of the tub. N.F. gave D.W. a towel, which D.W. wrapped around herself. N.F. and D.W. left together. After two or three minutes, N.F.'s sister went into N.F.'s room and saw blood drops going into the room "like by the door" and blood dripping down D.W.'s leg. N.F.'s sister also saw a puddle of blood by the "post of the bed." Additionally, the medical testimony supported a finding that D.W.'s injury was the result of forceful penetration of an object with enough rigidity to tear the vaginal opening. According to Dr. Falterman, a pre-pubescent penis, if used forcefully, could have caused D.W.'s injury. Additionally, Dr. Falterman testified that D.W.'s bleeding would have started immediately in relation to the time of the injury. Finally, the trial court stated that the evidence against N.F. was overwhelming even without considering his statements. Thus, even if N.F.'s initial statement to Detective McGalliard was the product of coercion, we conclude that any error in the admission of the statement was harmless.

11

Accordingly, this assignment lacks merit.

## ASSIGNMENTS OF ERROR NOS. 2 & 3:

N.F. argues that the trial court erred in concluding that the victim (a four-year-old at the time of trial) was competent to testify at the adjudication hearing and that the Hearts of Hope taped interview was admissible at the hearing. N.F. further argues that the trial court erred in admitting the videotaped interview as it was impermissible hearsay and a denial of N.F.'s right to confront his accuser.

*Competency of D.W. to Testify*

Prior to adjudication, N.F.'s counsel filed a Motion to Determine Competency of the Minor Victim and Minor Witness. Defense counsel agreed that the trial court's determination of the victim's competency could wait until trial. The first witness called by the State at the adjudication hearing was the victim, D.W. The State also asked permission for D.W. to sit on her mother's lap during her testimony. Defense counsel objected to the competency of D.W. and objected to D.W. sitting on her mother's lap. The trial court ruled as follows:

> Well, the Court has to - - obviously a four (4) year old is to be dealt with differently by the Court. The Court should be protecting her. And her knowledge of what's going on is not going to be - - I'll just have to take into consideration her age and the circumstances in determining how much weight to give her testimony.

Defense counsel also objected to D.W.'s competency based on her unresponsiveness in the Hearts of Hope interview. The trial court overruled the objections to D.W.'s competency without reasons.

As noted in appellate counsel's brief, the trial court did not make a formal ruling on D.W.'s competency to testify. Rather, the trial court stated that it would consider D.W.'s age and circumstances in determining the weight to give her testimony. In its denial of N.F.'s Motion to Vacate the Adjudication, the trial court stated that it gave great weight to D.W.'s testimony in adjudicating N.F. Thus, it

appears that the trial court determined D.W. was competent to testify. Accordingly, we will address the correctness of the trial court's determination that D.W. was competent to testify in both her Hearts of Hope interview and her testimony at trial.

In brief, appellate counsel alleges that despite defense counsel's questioning of D.W.'s competency to testify, the trial court "took no extra measures to assure her ability to tell the truth when she was called to the stand nor did he make a specific ruling on competency." Appellate counsel further asserts that nothing in D.W.'s testimony suggests she was a competent witness.

Jurisprudence has set forth the following guidelines in reviewing a trial court's determination of competency to testify:

> [Louisiana Code of Evidence Article] 601 provides: "Every person of proper understanding is competent to be a witness except as otherwise provided by legislation." Understanding, not age, is the test of whether any person shall be sworn as a witness. *State v. Linson,* 94–0061 (La.App. 1 Cir. 4/7/95), 654 So.2d 440, *writ denied,* 95–1120 (9/22/95), 660 So.2d 470; *State v. Troulliet,* 94–183 (La.App. 5 Cir. 9/14/94), 643 So.2d 1267. A key determination to be made is whether the witness is able to understand the difference between truth and falsehoods. *State v. Troulliet, supra; State v. Doss,* 522 So.2d 1274 (La.App. 5 Cir.1988), *writ denied,* 530 So.2d 563 (La.1988). Determination that a child is competent to testify as a witness is based not only on the child's answers to questions testing his understanding, but also in the child's overall demeanor. *State v. Bennett,* 591 So.2d 1193 (La.App. 1 Cir.1991), *writ denied,* 594 So.2d 1315 (1992).

> The trial court is vested with wide discretion in determining the competency of child witnesses. Its ruling as to competency is entitled to great weight on appeal, and will not be disturbed absent manifest abuse of discretion. *State v. Foy,* 439 So.2d 433 (La.1983); *State v. Troulliet, supra.*

*State v. Cedrington*, 98-253, p. 22 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 577, *writ denied*, 99-190 (La. 6/4/99), 743 So.2d 1249, *and writ denied*, 99-431 (La. 6/25/99), 745 So.2d 1182.

To begin, we note that the trial court failed to engage in any colloquy with D.W. to establish whether she understood the difference between the truth and a falsehood. Likewise, the State did not ask D.W. if she knew the difference between the truth and a lie. During her questioning of D.W., defense counsel asked D.W. if she knew what a lie was. The transcript does not reflect a verbal response but only "(Indicating)." Defense counsel then stated, "No? Okay."

During the Hearts of Hope interview, the interviewer attempted to explain to D.W. that she needed to tell only the truth, but D.W. did not respond to the interviewer and was more interested in coloring her pictures. Although D.W. responded correctly when the interviewer first asked her name, D.W. also responded "yes" when the interviewer asked if her name was D.J. In a series of questions apparently attempting to determine whether D.W. knew the difference between the truth and a lie, D.W. exhibited confusion. Pointing to a "red" bird, the interviewer asked D.W. the color of the bird. D.W. correctly stated that the bird was "red." However, when asked if the same bird was "blue," D.W. nodded "uh huh" and stated that the bird was "blue." Then, D.W. correctly stated that the water in the bird bath was "blue." When asked by the interviewer, however, if the water in the bird bath was "green," D.W. nodded "uh huh" and stated that the water in the bird bath was "green." The interviewer then asked D.W. whether she would be telling the truth or lying if she said the water in the bird bath was "blue." D.W.'s response sounds like either "lying" or "are you lying." The interviewer asked again if she would be telling the truth or lying if she said the bird bath was "green." D.W. would not answer. D.W. did, however, correctly state that the color of the bird was "red." Finally, near the conclusion of the Hearts of Hope interview, one of D.W.'s responses indicated some understanding of a lie. The interviewer asked D.W. about telling her daddy what happened to her. Instead of

14

responding as to what she told her daddy, D.W. stated that N.F. said he did not do it, and D.W. told him to stop lying because he did do it.

In its brief, the State argues that D.W.'s testimony indicates she was competent to testify---D.W. testified as to her age, where she attended school, her mother's name, and the number of her siblings. D.W. also testified both in the Hearts of Hope interview and at the adjudication that N.F. "got on her" and made her bleed.

Despite confusion in D.W.'s testimony, we note that her testimony was consistent that N.F. was the one who got "on her" and made her bleed. Additionally, D.W.'s accusations against N.F. were supported by other testimony at trial. N.F.'s sister testified that D.W. came to her house on July 3, 2012. According to N.F.'s sister, she, D.J., and D.W. all took a bath together and that D.W. was not bleeding when N.F.'s sister put her in the tub. N.F.'s sister called N.F. to get D.W. out of the tub. N.F. gave D.W. a towel, which D.W. wrapped around herself. N.F. and D.W. left together. After two or three minutes, N.F.'s sister went into N.F.'s room and saw blood drops going into the room "like by the door" and blood dripping down D.W.'s leg. N.F.'s sister also saw a puddle of blood by the "post of the bed." According to N.F.'s sister, D.W. was on the bed with her clothes off. N.F. had his clothes on. Moreover, N.F. admitted to D.W.'s accusations against him in both his statement to Detective McGalliard and his statement to Ms. Harding. Finally, the medical testimony supported a finding that D.W.'s injury was the result of forceful penetration and that her bleeding would have started immediately in relation to the time of injury.

Despite the trial court's failure to specifically question D.W. as to her understanding of the truth and a falsehood, this court finds that the trial court did not abuse its discretion in determining that D.W. was competent to testify. After

15

hearing D.W.'s Hearts of Hope interview and observing D.W.'s testimony at the adjudication hearing, the trial court placed great weight on D.W.'s testimony. Absent an abuse of discretion, this determination should not be disturbed on appeal. *State v. Foy*, 439 So.2d 433 (La.1983). Considering the physical evidence and other testimony that corroborated D.W.'s testimony, we find that the scant indications in the record as to whether D.W. knew the difference between the truth and a lie are not sufficient to overturn the trial court's finding of competency.

*Admissibility of Hearts of Hope Interview:*

In brief, N.F. alleges that the trial court erred in allowing the Hearts of Hope interview into evidence because the strict requirements of La.R.S. 15:440.1-440.6, pertaining to videotapes and other electronic recordings, were not met. Specifically, N.F. argues that the questions asked by the interviewer were calculated to lead D.W. to give a particular response, the questions asked by the interviewer were repeated over and over, and the answers given by D.W. were non-responsive. Additionally, N.F. asserts that D.W. was impressionable and not competent to testify. Finally, N.F. argues that his confrontation rights were violated by the admission of the videotape without the ability to effectively cross-examine D.W. as to the facts surrounding her accusations.

During the testimony of D.W., the State offered the Hearts of Hope video interview of D.W. At that time, defense counsel objected to the introduction of the tape based on "competency." The trial court noted defense counsel's objection but stated that it did not prohibit the viewing of the video. Defense counsel then stated she also objected to the "hearsay nature of the video," which the trial court overruled. A third time, defense counsel noted that she objected "to the qualifications of Ms. Joseph to conduct the interview." Defense counsel explained that there was nothing showing any type of certification of the interviewer. The

trial court overruled defense counsel's objection. Then, during the court's viewing of the interview, defense counsel objected, stating "For the record, Your Honor, I'd like to object to the response to no-response." The trial court told defense counsel to write notes and make her objections at the end of the interview. At the end of the playing of the interview, defense counsel noted her objection to D.W.'s non-responsiveness to questions and D.W.'s competency. The trial court overruled the objections.

We find that N.F.'s general "hearsay" objection to the Hearts of Hope video was not sufficient to preserve a challenge on appeal as to all of the requirements set forth in La.R.S. 15:440.1-440.6. "To preserve an error for appeal, Defendant must state the basis for the objection, point out the specific error to the trial court, and the grounds for the objection must be sufficiently brought to the trial court's attention so as to allow it the opportunity to make the proper ruling and prevent or cure any error." *State v. Dubroc*, 99-730, p. 17 (La.App. 3 Cir. 12/15/99), 755 So.2d 297, 308-09 (citing *State v. Trahan*, 93-1116 (La.App. 1 Cir. 5/20/94), 637 So.2d 694). Since N.F.'s general "hearsay" objection was not sufficient to preserve a challenge to all of the requirements set forth above, we will not address whether the requirements of La.R.S. 15:440.4 were met in this case for the videotape to be considered competent evidence.

Rather, we will address the specific arguments regarding the admissibility of the video-taped interview now raised in N.F.'s brief. As previously mentioned, N.F. alleges that questions asked by the interviewer were calculated to lead D.W. to give a particular response, that questions asked by the interviewer were repeated over and over, and that answers given by D.W. were non-responsive. Defense counsel raised only one of these allegations in the trial court -- the non-responsive answers by D.W. Thus, we find that the allegations as to the leading and

17

repetitious questions were not preserved for appellate review and will not be addressed. Further, the responsiveness of D.W.'s answers merely goes to her competency to give testimony and the weight to be given to that testimony by the trier of fact.

N.F.'s appellate counsel asserts that N.F.'s confrontation rights were violated by the admission of the videotape without the ability to effectively cross-examine D.W. as to the facts surrounding her accusations. Appellate counsel argues that because D.W. did not answer many of the questions posed to her about the facts which formed the basis of the accusations against N.F., N.F. was denied his constitutional right to confront his accusers. As this error was not alleged below, we find N.F. has not preserved it for appeal. *See State v. Marcantel*, 98-825 (La.App. 3 Cir. 12/22/99), 756 So.2d 366, *writ denied*, 00-208 (La. 8/31/00), 766 So.2d 1274.

Accordingly, this assignment lacks merit.

CONCLUSION

We affirm N.F's adjudication for aggravated rape. However, we amend the disposition to give N.F. credit for time served in a secure detention facility before the imposition of disposition, if any, and instruct the trial court to note the amendment in the court minutes. Additionally, we order the trial court to inform N.F. of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof in the record that N.F. received the notice.

**AFFIRMED AS AMENDED.**